**KRANJAC TRIPODI & PARTNERS LLP**
Xavier M. Bailliard (XB8980)
James Van Splinter (JV0258)
30 Wall Street, 12th Floor
New York, New York 10005
Tel: (917) 534-6127
Fax: (646) 216-2373
xbailliard@ktpllp.com
jvansplinter@ktpllp.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| OM 900 CENTRAL AVENUE, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> THE CITY OF UNION CITY, UNION CITY RENT STABLIZATION BOARD AKA THE CITY OF UNION CITY RENT LEVELING BOARD, <br><br> Defendants. | Civil Action No. <br><br> **COMPLAINT** |

Plaintiff OM Central Avenue, LLC, ("Plaintiff"), by and through its attorneys, Kranjac Tripodi & Partners LLP, as and for its Complaint against Defendants alleges as follows:

**INTRODUCTION**

1.     Plaintiff brings this action under 42 U.S.C. § 1983, as a result of the shocking abusive acts of Defendants who, under color of law, engaged in a collective and coordinated scheme to not only deprive Plaintiff of its right to collect legal rents from its tenant, but to also demand that Plaintiff reimburse its tenant for improperly calculated overcharges of rent that had purportedly been charged to the tenant by prior owners of Plaintiff's property.

2.     Through this shocking abuse of power set forth in detail below, Defendants knowingly and deliberately deprived Plaintiff of its constitutional rights to due process.

## PARTIES

3.      Plaintiff is a New Jersey limited liability company with its principal place of business located at 316 Eisenhower Parkway, Livingston, New Jersey 07039.

4.      Plaintiff is currently the owner of the property located at 900 Central Avenue, Union City (the "Property").

5.      Defendant, the City of Union City (the "City"), is a municipal corporation and political subdivision of the State of New Jersey that has authorized the establishment of and has control over the actions of its agency, the City of Union City Rent Leveling Board.

6.      Defendant City of Union City Rent Leveling Board (the "Board") is a public entity with offices located at 3715 Palisade Avenue, Union City, New Jersey 07087.  The Board is a body of the City of Union City established pursuant to New Jersey law and Union City municipal ordinance and is empowered to execute, consistent with New Jersey law, Union City's rent control ordinance.  In this regard, the Board is statutorily tasked with, among other things, enforcing the City of Union City's rent stabilization ordinance.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because Counts One through Three of the Complaint arise under 42 U.S.C. § 1983.

8.      The Court has supplemental jurisdiction over the state law claim in Count Four pursuant to 28 U.S.C. § 1367(a) because the claim is so related to the federal claims that they form the same case or controversy.

9.      Venue is proper under 28 U.S.C. § 1391(b) and (c) because all Defendants are subject to personal jurisdiction in the District of New Jersey and because a substantial part of the events or omissions that gave rise to this action occurred in the District of New Jersey.

**FACTUAL SUMMARY**

**I.      UNION CITY ADOPTS RENT CONTROL IN 1973.**

10.     New Jersey is one of only four other states (New York, Maryland, Oregon and California) plus Washington, D.C., that imposes rent control.

11.     While some states enforce rent control statewide, New Jersey's rent control ordinances are enacted by municipalities.

12.     New Jersey adopted rent control in or around 1973.

13.     In or around that time, in 1973, Union City passed its first rent control ordinance ("Ordinance").   Among other drastic measures, the Ordinance established as of 1973 a base rent for all rent-controlled units in Union City.  Any permissible increase in the base rent amount under the Ordinance was to be calculated from that original 1973 base rent.

14.     In 1996, after having already adopted six (6) amendments to the Ordinance over the years, Union City adopted a seventh amended ordinance (the "1996 Ordinance").   Of particular import, the 1996 Ordinance contained an express and unambiguous decontrol provision that allowed for a reestablishment and/or reset of the original base rent of 1973 (from which allowed increases were to be calculated) for any rent-controlled unit that became vacant subsequent to the adoption for the 1996 Ordinance.

15.     Specifically, the 1996 Ordinance provided that:

Existing tenants will continue to be protected by rent control while they remain in their units.  For these tenants, a landlord must still comply with the requirements of this chapter. All rents established by landlords and tenants on March 1, 1973, and any subsequent increase shall represent the base rent from which permitted increases are calculated.  **As to**

**those units vacant at the time of the adoption of this chapter or which subsequently become vacant under the terms of this chapter, the rent agreed to by the landlord and tenant shall become the new base rent by which the permitted increases under this chapter shall be determined.**

*See* 1996 Ordinance at § 14-2(c) (emphasis added).

16.     This vacancy decontrol existed in Union City until May 21, 2013.

17.     In short, upon the vacancy of any unit from 1996 to May 21, 2013, a landlord was permitted to establish a new base rent for that unit upon agreement with the new tenant.  Any subsequent permitted increases to the rental amount would be based upon that newly established base rent.

## II.    UNION CITY IGNORES ITS RENT CONTROL ORDINANCE AND RECORDS IN ORDER TO PREVENT PLAINTIFF FROM CHARGING LEGALLY PERMITTED RENT.

18.     Plaintiff purchased the Property in January 2019.

19.     At the time Plaintiff, Jorge Ortiz ("Ortiz") resided in Apartment 16 of the Property

20.     Ortiz had moved into Apartment 16 in or around 2017, as is evidenced by the 2017 Rent Registration Statement filed with the City by the then current owner of the Property.

21.     When Ortiz moved into Apartment 16, the legal registered rent for the apartment was $1,598.64, which had been calculated based on legal annual increases for Apartment 16 and reported on the 2017 Rent Registration Statement filed with the City by a prior owner of the Property.  That said, as set forth, below, Ortiz was only paying $1,400.00 at the time pursuant to a lease agreement he had entered with the prior owner.

22.     Since 2009, and prior to Plaintiff having purchased the Property, there had been three (3) other prior owners.

4

23.     More, since 2009, and prior to Plaintiff having purchased the Property, Apartment 16 had been occupied by three (3) other tenants and had also been vacant for two years, as is evidenced by the 2009-2019 Rent Registration Statements filed with the City by the owners of the Property.

24.     Specifically, the 2009-2011 Rent Registration Statements demonstrate as follows.

25.     In 2009, Apartment 16 was occupied by a first tenant who vacated the apartment in or about the end of 2009.  At the time, the legal rent for Apartment 16 was $746.79.

26.     In 2010, Apartment 16 was vacated and underwent a complete renovation (including complete sheetrock replacement, new electrical and plumbing, new bathroom and kitchen, and all new floors), as a result of which the owner sought and obtained approval for a rent unit restoration allowance ("RURA").

27.     A RURA, which was established in 2005 when the Rent Levelling Ordinance of Union City was amended, provided a mechanism wherein upon a vacancy of a unit, the property owner was permitted to increase the base rent for that unit upon renovation of that unit during the vacancy (the amount of the increase would be tied to the costs of the renovation work).

28.     Upon completion of the renovations, and as a result of the RURA for Apartment 16, the new base rent for Apartment 16 as of 2011 was set at $1,293.75.  This new base rent and the RURA was expressly set forth in the Rent Registration Statement for 2011.

29.     From 2011 to 2014, a second tenant moved into and occupied Apartment 16.  As of 2014, due to legally permitted rental increases, the rent for Apartment 16 was set at $1,434.41.

30.     In 2015, a third tenant moved into Apartment 16, but stayed for only one year.  As such in 2016, Apartment 16 was again vacant.

31.     In 2017, a third tenant moved into Apartment 16, at which time the legal base rent, with allowed increases,  was $1,564.23.

32.     All of these valid legal rent amounts were properly noted in each of the Rent Registration Statements filed by each of the owners, which statements were accepted, checked, and maintained in the City's files.

33.     In or around April 2018, Ortiz moved into Apartment 16.  At the time, Ortiz was a supervisor for the Union City Department of Public Works, and the City had specifically requested that the owner of the Property at the time rent the apartment to Ortiz and hire Ortiz as superintendent for the property.

34.     Even though the legal base rent for the apartment at the time was $1,598.64, the then current owner/landlord of the Property entered into a written lease agreement with Ortiz, by which the owner and Ortiz agreed upon a lower rent amount of $1,400.00 per month, minus a monthly credit of $400 for Ortiz serving as superintendent for the building.

35.     As such, in 2019, when Plaintiff purchased the Property, Ortiz had agreed to and paid rent in the amount of $1,400 per month, minus the monthly credit of $400 for Ortiz serving as superintendent for the building (for a total of $1,000).  However, as evidenced by the Rent Registration Statements submitted by Plaintiff and accepted and maintained by the City, the actual legal permissible rent for Apartment 16 in 2019 was actually higher, i.e. $1,627.41.

36.     In 2020, as evidenced by the Rent Registration Statements submitted by Plaintiff and accepted and maintained by the City, the legal permissible rent for Apartment 16 increased to $1,650.19.  However, Ortiz, from January 1, 2020 to June 30, 2020, continued to pay only $1,400 per month, minus the monthly credit of $400 for Ortiz serving as superintendent for the building (for a total of $1,000).  As of July 1, 2020, Ortiz no longer served as superintendent; as such, he no longer received a $400 credit and his actual rent (pursuant to his lease agreement with the prior owner) was $1,400.  Again, this amount was still lower than the legally allowable rent of $1,650.19.

37.     Ortiz paid this $1,400 rent through 2020.

38.     From 2011 through 2020, not one of the tenants, including Ortiz, complained about the legal rent charged for Apartment 16.

39.     More, from 2011 through 2020, the City, who was aware of (i) the vacancy of Apartment 16 in 2010, (ii) the complete renovation of Apartment 16 in 2010, (iii) the RURA sought and obtained by the then owner of the building as a result of the renovation of Apartment 16, (iv) the new base rent of $1,293.75 set in 2011 as a result of the renovations and RURA of Apartment 16, (v) the new base rent agreed to by the new tenant in 2011 after the apartment had been vacated in 2010, and (vi) the legal rental increases of the new base rent through 2020, never informed and/or challenged the new base rent or RURA in 2011 or the legally permissible rental increases through 2020 (which legal rent as of 2020 totaled $1,650.19).

40.     Then, on or about May 2021, Ortiz filed a complaint with the Rent Leveling Board regarding his rent.

41.     Again, prior to that date, Ortiz had never complained about his rent.

42.     Upon information and belief, Ortiz only complained about his rent in 2021 at the suggestion of City officials.

43.     In fact, as set forth above, Ortiz has been and currently is a supervisor for the Department of Public Works of Union City.  As a result thereof, and as set forth above, Ortiz was a politically favored citizen of the City.

44.     Despite receiving this complaint, the City never informed Plaintiff of the filing of the complaint.  And the City never allowed Plaintiff to provide a response.

45.     Then, over two years after Plaintiff purchased the Property and over three years after Ortiz continued to pay the rate he had agreed to pay pursuant to his written lease, Plaintiff received a letter from the City of Union City, dated May 4, 2021, regarding Ortiz's rent.

46.     Specifically, in the letter, the City informed Plaintiff that (i) on some unspecified date, Ortiz had visited the Rent Leveling Board's office and had purportedly complained to the City about his rent for Apartment 16, and (ii) the City took it upon itself, without notice to Plaintiff, to unilaterally recalculate and lower Ortiz's rent to $845.79 per month, effective November 1, 2019.  In the letter, the City did not set forth what documents the City had reviewed to calculate the new rent (other than to state that it had reviewed "your rent registration files").

47.     On July 12, 2021, Plaintiff received a second letter from the City, specifically from Kennedy Ng ("Ng"), the Rent Leveling Administrator of the Union City.  In this letter, Ng now notified Plaintiff that in light of the unilateral new rent amount calculation set forth in its May 4, 2021, the City had (again unilaterally) assessed Plaintiff with an overcharge to Ortiz in the amount of $9,244.50, which Ng directed to be paid back to Ortiz.

48.     In addition to the impropriety of the City assessing any surcharge to Plaintiff (as set forth below), the overcharge amount included approximately $1,000.00 of rents that had been collected by the previous owner of the Property – prior to Plaintiff having purchased the Property in 2019.

49.     However, pursuant to the City's own Ordinances, even if the City had been authorized to assess any overcharge (e.g. if the new rent calculation had been correct, which it was not), the City was still not entitled to assess that additional portion of the overcharge, since the provision in the Ordinance that permitted such assessment was not in effect at the time the Property was purchased by Plaintiff, and thus could not be applied to Plaintiff.  Indeed, that provision, i.e. § 334-5(a)(3)(k) (which

provides that overcharges run with property and a successor owner shall be responsible for any refund) exists only in the 2019 Ordinance, which was adopted *after* Plaintiff purchased the Property. Indeed, the applicable ordinance at the time Plaintiff purchased the Property was the 2017 Ordinance, which makes no mention of any overcharge running with a property or that a successive property owner shall be liable for said overcharges incurred prior to the purchase of the property.

50.     Plaintiff had never received any complaint from Ortiz, and had never been informed by the City that Ortiz had made any complaint regarding his rent to it.   The City had also never notified Plaintiff  that it intended to perform, and in fact performed, a review and recalculation of Ortiz's rental rate and in turn had determined that an overcharge was due.  As such, Plaintiff was never given any opportunity to object to, appeal, or even review the documents upon which Ng relied to reduce the purported legal base rent.

51.     This deliberate failure to provide any notice to Plaintiff is yet a further example of Defendants' carefully crafted scheme by which they routinely deprive property owners' rights by unilaterally—and without any notice to the landlord—improperly and arbitrarily lower rents for tenants and then direct those tenants to immediately begin paying the lower rent (or no rent at all with the anticipation of a credit refund).

52.     More, as set forth above, this overcharge calculation by the Rent Leveling Board (and specifically Ng) was inaccurate as it failed to take into account (i) the RURA resulting from the 2010 renovations (which allowed an increase in the base rent, and (ii) the fact that Apartment 16 had been vacated in 2010 during the City's rent decontrol period (i.e. from 1996 to May 21, 2013) and thus, that the new rent agreed to by the tenant who moved into Apartment 16 in 2012 (after the renovations were completed) became the new base rent.

53.     More, Ng informed Plaintiff that it owed the entirety of this overcharge (dating back to 2018) and mandated that Plaintiff pay said overcharge within ten (10) days, even though it had only purchased the Property in 2019.  In so directing Plaintiff to pay this overcharge within ten (10) days, Ng deliberately and knowingly prevented Plaintiff from exercising its right to appeal the overcharge calculation.

54.     In an effort to determine to what documents the City was referring to in its letters regarding the purported rent and overcharge, Plaintiff sought, via at least two OPRA requests dated July 6, 2021 and a third dated August 4, 2021, the full and complete rent control file for the Property. Prior to these requests, Plaintiff had also previously sought all files related to the property in early 2020 (shortly after it had purchased the property) seeking all rent control documents related to the Property.  This necessarily included all documents in the City's file related to the rental rate for Apartment 16.

55.     However, each response received from the City to these OPRA requests was incomplete (either due to complete incompetence, or worse, deliberate acts on the part of the City).

56.     In response to the 2020 OPRA request, which sought all rent control records related to the Property, the City produced correspondence and rent calculations from 1984 to 2019, but did not include any information or records related to the substantial renovations done to Apartment 16 in 2010 (e.g. permits, certificates of approval, etc.) or the RURA that had been sought and obtained as a result thereof.

57.     In response to the July 16, 2021 OPRA request, which again sought all rent control records related to the Property, the City produced correspondence and rent calculations from 1987 to 2019, but again did not include any information or records related to the substantial renovations done

to Apartment 16 in 2010 (e.g. permits, certificates of approval, etc.) or the RURA that had been sought and obtained as a result thereof.

58.     In response to the second July 16, 2021 OPRA request, which sought the complete permit file for Apartment 16 (which would necessarily include the RURA application and approval for the renovation work performed in 2010), the City produced permits, approval stickers, and other related documents, but did not produce any records regarding the RURA for Apartment 16.

59.     Despite these four OPRA requests, and purported complete responses by the City, Plaintiff would later obtain records of the RURA (from a prior owner) that should have been in the City's files, but were not produced.  In addition, as set forth below, at the hearing on Plaintiff's appeal of the City's rent calculation and overcharge, the City would subsequently ambush Plaintiff with previously undisclosed and unproduced documents related to the rent calculation of Apartment 16.

60.     As a result of the City's failure to properly calculate Ortiz's rent by ignoring and concealing (i) the RURA resulting from the 2010 renovations, and (ii) the fact that due to rent decontrol still set forth in the City's Ordinance, the new base rent for Apartment 16 was reset when it was rented in 2012 after being vacant during the renovations, Plaintiff OM 900 Central Avenue timely appealed the City's rent calculation.

61.     As such, a hearing was scheduled on September 13, 2021 before the Board on Plaintiff's appeal.

62.     Prior to the hearing the City assured Plaintiff that the City had done a full and extensive search in its files and that there was no evidence of any RURA having been requested.  In response, Plaintiff presented counsel for the Board with a copy of a Certificate of Compliance (the "RURA Certificate of Compliance") evidencing the RURA for Apartment 16.  Of course, this

document had not been previously produced by the City as required in response to OPRA requests. Instead, Plaintiff had been able to locate a copy by contacting the former owner at the time, who provided Plaintiff with the copy.

63.     Once the City was presented with the RURA Certificate of Compliance, it sought an adjournment of the hearing, as it understood that (i) its files were either incomplete or had not been properly searched, and (ii) this RURA Certificate of Compliance evidenced the RURA that had been ignored in connection with the rent and overcharge calculation for Apartment 16.  As such, in an effort to impose upon Plaintiff an improper calculation of rent and overcharge to a favored citizen, the City needed to figure out a way to somehow attack the validity of the RURA Certificate of Compliance

64.     A new hearing was thus scheduled for December 20, 2021.

65.     However, at the same Board meeting on September 13, 2021 in connection with another appeal of another improper rent calculation by the City for another unit at another property owned by another limited liability company with the same members as the members for each of Plaintiffs, that company challenged the City's rent calculation on the grounds that there had been a vacancy in that particular unit during the City's rent decontrol period of 1996 to 2013 and thus, the base rent used by the City was improper.  Incredibly unaware of the content of the City's own Ordinances—including extremely important and vital provisions such as rent decontrol—the Board requested that the parties brief the issue of whether the City's Ordinances provided for rent decontrol from 1996 to 2013 upon the vacancy of a unit.  Unsurprisingly, after reviewing the briefing, the Board acknowledged that the City's Ordinances provided for rent decontrol from 1996 to 2013, and entered a Resolution on November 20, 2021 resolving that rent decontrol existed from 1996 to 2013. Incredibly, the City's own Board had to be educated on critical provisions in the City's Ordinances.

66.     On December 20, 2021, Plaintiff's appeal was finally heard before the Board.

67.     However, this hearing was a sham and a decision denying the appeal was predetermined.

68.     At the hearing, Plaintiff presented two separate reasons as to why the City's recalculation of the rent for Apartment 16 was clearly incorrect – each of which, standing on its own, was sufficient to overturn the City's improper rent recalculation.

69.     The two reasons, as set forth in more detail below, were (i) the prior owner had obtained an RURA in 2011 as a result of renovations that were performed in Apartment 16 and, thus, was legally allowed to increase the base rent as a result thereof, and (ii) there was a vacancy in Apartment 16 in 2010, during which there existed rent decontrol in Union City, which allowed the owner to reset the base rent at an amount agreed to by the new tenant who moved into the apartment in 2011.

### A.     THE CITY IGNORED PLAINTIFF'S DIRECT EVIDENCE THAT A RURA HAD BEEN OBTAINED FOR APARTMENT 16 AND RELIED ON INCOMPLETE AND PREVIOUSLY UNPRODUCED DOCUMENTS.

70.     Plaintiff first argued that in 2010, when Apartment 16 was fully renovated, a RURA was obtained by the then current owner, which properly raised the legal rent from $772.93 to $1,250.00.  As direct evidence of this, Plaintiff introduced (i) the RURA Certificate of Compliance by the City of Union City and signed by Ng, by which the City approved the RURA for Apartment 16; (ii) Rent Registration Statements from 2009, 2010, and 2011 that showed that there was a vacancy in Apartment 16 in 2010, during which renovation work was completed, and that the rent charged increased from $772.93 in 2010 to $1,250.00 in 2011 as a result of a RURA; (iii) permits and approval stickers for the renovation work completed in 2010; and (iv) a Certificate of Approval issued by the City of Union City building department, dated December 8, 2010, certifying that the

renovation/construction work (specifically described in the Certificate as "Apartment Renovation-Sheetrock, 5/8 inch walls/repair floors/replace plumbing and electrical fixtures/install smoke detectors") in Apartment 16 was completed and constructed in accordance with the New Jersey Construction Code.

71.     This ample evidence demonstrated that Apartment 16 was completely renovated in 2010, that a RURA had been obtained for that apartment, and that as a result thereof, the new rent as of 2011 was $1,250.00.  The evidence also showed separately that (regardless of the RURA) because the apartment had been vacated in 2010 and rented to a new tenant in 2011, the new rent agreed to by that new tenant was the new base rent (due to the City's rent decontrol being still in place at the time), again $1,250.00.  From that rent amount, Plaintiff demonstrated that the new rent calculation by the City was wrong and much lower than the allowed amount (which, with allowed rent increases, was $1,650.19 as of 2020).

72.     In response, the City took wildly shocking positions as to each piece of evidence submitted by Plaintiff, and essentially rejected and/or ignored them all without any valid factual or legal basis.

73.     As for the RURA Certificate of Compliance , the City took the position that because it was not an original with a raised seal, it could not be relied upon and was essentially worthless. This position was preposterous.  First, Ng, whose signature was on the RURA Certificate of Compliance, admitted that the signature was his and, in fact, genuine.  Second, the RURA Certificate of Compliance had a valid IAC number issued by the City and a paid receipt number.  Third, the fact that there was no seal visible on the document was because it was a copy and not the original, as it was maintained as a digital file by one of the prior owners and emailed to Plaintiff.  As explained by Plaintiff, it was not the owner at the time the RURA Certificate of Compliance was issued and thus it

could not have a copy of the original.  As such, the fact that the seal was not visible did not mean that no seal was on the original.  Fourth, and more importantly, Ng admitted that he has never and would never sign a RURA Certificate of Compliance if he did not first review all relevant documents to ensure that everything was properly submitted and completed and that a final inspection had been completed for the issuance and approval of the RURA.  Notwithstanding all of this, the City argued that the RURA Certificate of Compliance was essentially invalid because it was not the original – despite offering no legal support for its position that an original was required and that a copy thereof could not be submitted as valid evidence (because there existed none).

74.     In addition, in an effort to further compromise the validity of the RURA Certificate of Compliance for Apartment 16, the City introduced a copy (not original) of a letter dated September 20, 2018 from the City to the then owner of the Property in which Ng purportedly informed the then current owner that it had submitted an incomplete application for an RURA for Apartment 16 that had not been supplemented and thus was being denied.

75.     However, as set forth below, this letter was a fake, as it was evidently prepared after the fact and solely in anticipation of the hearing by Ng.

76.     Indeed, there were numerous glaring problems with this letter, which should have prevented it from being used during the hearing.  First, it was produced for the first time at the hearing time and was never produced by the City in response to any of the OPRA requests that Plaintiff had made, even though it was absolutely responsive and would obviously have been in the City's file (as such, it was either deliberately withheld or never was in the file because it was a fake document).  As such, Plaintiff had never seen the document before and thus had no opportunity to obtain additional information related to it (e.g. to inquire if the RURA referred to in the letter was even the same as the one obtained as a result of the 2010 renovations).  Second, for months prior to the hearing, the City

had repeatedly represented to Plaintiff that it had no records of any RURA for the Property.  Third, at the first scheduled hearing in September 2021, the City made clear that it had no knowledge or records of any RURA application for Apartment 16, yet now it was providing a document that made direct reference to the RURA for that apartment (as such, either the City had concealed this document or it did not make reasonable efforts to comply with its OPRA obligations in responding to Plaintiff's OPRA requests).  Fourth, as is set forth at length above, the City's records are at best incomplete; as such, even if the letter were genuine, it is very likely that the City lost documents submitted by the prior owner as it related to the RURA resulting from the 2010 renovations.  Fifth, the letter is dated September 20, 2018 and states that the application for an RURA was denied, when the City had received and accepted Rent Registration Statements for the apartment since 2011 (i.e. 7 years) that showed that the rent was increased in 2011.  Sixth, the letter was purportedly sent via certified mail and identifies a tracking number; however, that tracking number does not show that the letter was ever sent or delivered.  More, since the letter contains a tracking number, the City must have maintained in its files the return receipt for the letter; however, the return receipt for the letter was conveniently not provided by the City.  This is because the tracking number was fake – the letter had never been sent.

77.     Despite all of these defects in the letter, the City argued that it was nonetheless valid and contradicted the valid RURA Certificate of Compliance.

78.     In addition to having failed to produce this letter as obligated under OPRA, the City also admitted for the first time at the hearing that it was in possession of the preapplication for the RURA, dated July 2010, that had been submitted by the then owner of the Property for Apartment 16.  And more, the City also admitted that it had in its possession a list of all pending RURAs, which was also relevant to the issues presented at the appeal (e.g. whether the RURA in question was

16

complete or still pending).   However, again, while directly responsive to Plaintiff's OPRA requests, the City failed to produce these documents as well.

79.     Again, the City's failure to produce these documents (like the September 20, 2018 letter) prevented Plaintiff from having a full and complete record that it needed for purposes of its appeal.

80.     Worse yet, when confronted with the fact that it had failed to produce both the September 20, 2018 letter and the preapplication letter, the City admitted that there possibly existed additional documents responsive to Plaintiff's OPRA requests that had not been produced by the City – again depriving Plaintiff of having a full and complete record for its appeal.

81.     As for the Rent Registration Statements, they showed that in 2009 there was a tenant, that in 2010 there was a vacancy, and that in 2011, there was a new tenant.  The Rent Registration Statement for 2011 also showed that there was a rent increase from 2010 specifically due to the vacancy and the RURA.

82.     In response, the City merely argued again that because Rent Registration Statements are completed by the owner of the property, they are inherently unreliable and, thus, cannot be accepted as evidence for anything.

83.     The City's reasoning for unilaterally refusing to consider this documentary evidence was entirely arbitrary and knowingly disingenuous.  Indeed, pursuant to Section 334-16 of City's current Ordinance, owners are required to register their tenants/rents via a rent registration statement.  In setting forth this requirement, the City necessarily acknowledges and concedes that the information on a rent registration statement is valid and provides sufficient evidence of, among other things, (i) the occupant of a unit (*see* § 334-16(1)(a)) and (ii) the current rent for the unit (*see*

§ 334-16(1)(c).  In fact, the City had accepted, checked, and relied upon the information contained in the rent registrations for the Property for decades.

84.     However, apparently, pursuant to the City, the City has full and complete arbitrary discretion as to when it chooses to rely on registration statements (e.g. when it benefits the City) or when to reject information on a registration statement (e.g. when it favors a property owner).

85.     As for the permits and stickers from 2010 proving that the renovation work was completed in 2010 (thus allowing for the RURA), the City argued that they should also not be relied upon because Plaintiff had not provided proof of payment for the permits or for the work and had not provided pictures of the renovation work.  However, the permits and stickers were issued by the City and produced by the City in response to Plaintiff's numerous OPRA requests.  To disregard them entirely just because Plaintiff did not include receipts or pictures is beyond comprehension and reeks of bad faith.

86.     Finally, as for the Certificate of Approval dated December 8, 2010 for the renovation work in 2010—which is a document issued by the City Building Department that is required to allow a resident to move into a unit/building after construction work is completed and thus absolutely demonstrated that Apartment 16 had been renovated and that the work was complete—the City simply chose to ignore it and argued that it meant nothing because Plaintiff did not also produce a Certificate of Occupancy for the apartment.  However, a Certificate of Occupancy would only have been issued upon the completion of the new construction of the property, and not after the renovation of a single unit.

**B.  THE CITY IGNORED PLAINTIFF'S DIRECT EVIDENCE THAT THERE HAD BEEN A VACANCY IN THE APARTMENT DURING RENT DECONTROL.**

87.  Plaintiff also argued that, regardless of whether an RURA was obtained (which evidence showed it was), the City's recalculation of the rent for Apartment 16 was faulty because it ignored the fact that there had been a vacancy in the apartment in 2010, during which the City's Ordinance provided for rent decontrol.  Due to this rent decontrol, the owner was allowed under the City's Ordinance to set a new base rent for the apartment if/when it was subsequently rented to a new tenant who agreed to the new amount.

88.  This was exactly the case here, and Plaintiff presented uncontroverted evidence supporting this position.

89.  Specifically, as set forth above, Plaintiff introduced the Rent Registration Statements for the years 2009, 2010, and 2011.  Plaintiff then demonstrated that (i) the 2009 Rent Registration Statement showed that Apartment 16 was occupied by a tenant at the monthly rate of $746.79, (ii) the 2010 Rent Registration Statement expressly showed that the apartment was vacant in 2010, and (iii) the 2011 Rent Registration Statement showed that a new tenant had moved into the apartment at a new set rate of $1,250.00.

90.  Plaintiff then demonstrated that, at the time the apartment became vacant, the City's Ordinance provided that if/when a unit becomes vacant, the owner is allowed to set a new base rent for that unit upon agreement of the new amount with the new tenant who subsequently moves into the apartment.  Just like what happened with Apartment 16 in 2010 and 2011.

91.  To further support the fact that the apartment had been vacant in 2010 (even though it was unnecessary), Plaintiff presented the permits for the renovation work performed in 2010 and the Certificate of Approval dated December 2010 showing that the work was complete.

92.     As such, pursuant to the City's Ordinance, when the new tenant moved into the vacant apartment in 2011 and agreed to the new rent of $1,250.00, that rent amount became the new base rent.

93.     After hearing testimony and argument, the Board disregarded all of Plaintiff's evidence and denied its appeal.

94.     Specifically, as to the issue of the RURA, the Board blatantly ignored all of the evidence set forth by Plaintiff showing that an RURA had been obtained and that a complete rehabilitation of the apartment had been completed in 2010 (via the rent registration statements, permits, stickers, and Certificate of Approval).   Instead, it relied on the existence of the previously unproduced copy of the September 20, 2018 letter (stating that an unidentified RURA application had been denied and for which there was no evidence that the letter was even sent) and the fact that the RURA Certificate of Compliance was issued in 2015 (again, with no explanation of why it had been issued as of 2015 even though the renovation work had been completed and approved by the City in 2010).

95.     As to the issue of the vacancy in 2010 and rent decontrol (which allowed a new base rent to be established in 2011), the Board again completely disregarded the evidence set forth in the Rent Registration Statements, permits, and Certificate of Approval that unequivocally demonstrated that there had been a vacancy in 2010 (during the time of rent decontrol).   Instead, it relied exclusively and improperly on the fact that because the RURA Certificate of Compliance was dated January 22, 2015, a tenant could not have moved into the Apartment 16 until after that date (because a tenant was could not have been allowed to occupy the unit prior to the issuance of the RURA Certificate of Compliance, from 2010 to 2015).   As such, the City improperly concluded that because there was no rent decontrol in 2015, there was never a new base rent established in 2011.

96.     Plaintiff attempted to explain that the RURA issue was separate and distinct from the vacancy during rent decontrol and thus that the fact that the RURA Certificate of Compliance was dated January 22, 2015 was a complete red herring and had nothing to do with whether there had been a vacancy in 2010, which allowed for a new base rent to be set (which was demonstrated via the evidence submitted before the Board).  This fell on deaf ears.

97.     In short. the Board disregarded, arbitrarily and without any legal basis, all of Plaintiff's evidence regarding the RURA and vacancy for Apartment 16 and instead relied on incomplete and previously unproduced documents of the City to deny Plaintiff's appeal.

98.     On April 14, 2022, Plaintiff was served with the Board's Resolution denying its appeal.

99.     In its Resolution, the Board memorialized that it rejected documentary evidence of (i) the RURA for Apartment 16, which allowed for a rent increase, on the grounds that because the copy of the RURA Certificate of Compliance submitted by Plaintiff did not have a visible raised seal, it was not valid, (ii) the Certificate of Approval dated December 8, 2010 and the fact that a tenant is permitted to move in after issuance thereof, and (iii) the vacancy in Apartment 16 in 2010 (which, per the City's rent decontrol at the time, allowed the new base rent to be reset upon the apartment being occupied in 2011), on the sole grounds that because the RURA Certificate of Compliance was dated in 2015, there could not have been a vacancy in 2010.

100.     In so doing, the Board therefore arbitrary, capriciously and unreasonable ignored relevant information in its Resolution.

101.     Based upon these erroneous findings, the Board upheld the City's new rent determination of $857.63 and the $9,244.50 overcharge.

102.   In short, the Board and City blatantly violated Plaintiff's rights in order to improperly lower a politically favored resident's rent for Apartment 16.

103.   As a result of Defendants' coordinated egregious abuse of power, under color of law, Plaintiff has suffered extensive monetary and other damages in the form of, among other things, lost rents and the diminution of the value of its property.

## COUNT ONE
## FIFTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUION
## TAKINGS CLAUSE
## (42 U.S.C. § 1983)

104.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

105.   The Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution provides ". . . nor shall private property be taken for public use, without just compensation."

106.   The actions of Union City as aforesaid fail to substantially advance any legitimate purpose and have the effect of depriving Plaintiff of the beneficial use of its property, in violation of Plaintiff's constitutional rights as secured by the Fifth and Fourteenth Amendments to the United States Constitution.

107.   As a result of Defendants' actions as aforesaid, practical and feasible use of Plaintiff's property and rights has been denied.

108.   The actions of Defendants as aforesaid have the effect of regulating Plaintiff's property, without compensation having been paid, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

## COUNT TWO
## DEPRIVATION OF SUBSTANTIVE DUE PROCESS UNDER THE
## FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
## (42 U.S.C. § 1983)

109.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

110.    Plaintiff has the right to substantive due process, guaranteed under the Fourteenth Amendment of the United States Constitution, not to be deprived of their constitutionally protected property interests and liberties and to be free from the deliberate and arbitrary abuse of government power.

111.    Plaintiff has property interests and liberties in the ownership of its properties, leaseholds, and operation of its businesses.

112.    Defendants in this action acted under the color of state law.

113.    Defendants have arbitrarily and capriciously interfered with Plaintiff's constitutionally protected property interests and rights to operate a business.

114.    Defendants acting under color of law, deliberately, unreasonably, arbitrarily and capriciously, among other things, (i) improperly calculated the rent for Plaintiff's tenant, who was a politically favored citizen, for the benefit of that citizen and at the expense of Plaintiff, (ii) improperly disregarded the City's Ordinance, (iii) improperly disregarded the City's own records, including permits, stickers, Certificates, and Rent Registration Statements, (iv) deliberately failed to provide complete responses to Plaintiff's repeated OPRA requests, thereby forcing Plaintiff to appear at its appeal with an incomplete record, (v) relied on doctored/fake documents previously withheld by the City and introduced for the first time at the time of the appeal hearing, (vi) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent,

and (vii) improperly placed liability on Plaintiff for prior rents collected by the prior owners of the Property.

115.    The actions of Defendants as aforesaid lacked any legitimate reason and were arbitrary, capricious, not rationally related to any legitimate government interest, improperly motivated and conscience-shocking, in violation of the substantive due process guaranteed by the Fourteenth Amendment to the Constitution of the United States of America.

116.    The actions of Union City as aforesaid were taken out of ill will and designed to harm Plaintiff and to deny it the legal and proper use of its property.

117.    Defendants acted with knowledge that its actions against Plaintiff were unrelated to any legitimate government interest.

118.    Plaintiff has been deprived of the legal and proper use of its property, leasehold, and business and was otherwise injured as a result of Defendants' actions.

119.    As such, by the aforementioned conduct, Defendants have denied Plaintiff its rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

**COUNT THREE**
**DEPRIVATION OF PROCEDURAL DUE PROCESS UNDER THE**
**FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**
**(42 U.S.C. § 1983)**

120.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if set forth at length herein.

121.    Plaintiff has the right to procedural due process, guaranteed under the Fourteenth Amendment of the United States Constitution.

122.    Defendants have arbitrarily and capriciously interfered with Plaintiff's constitutionally protected right to procedural due process by depriving Plaintiff of its liberty and

property interests without one of the fundamental elements of procedural due process, *i.e.* the opportunity to be heard.

123.    Defendants acting under color of law, deliberately, unreasonably, arbitrarily and capriciously, among other things, (i) improperly calculated the rent for Plaintiff's tenant, who was a politically favored citizen, for the benefit of that citizen and at the expense of Plaintiff, (ii) improperly disregarded the City's Ordinance, (iii) improperly disregarded the City's own records, including permits, stickers, Certificates, and Rent Registration Statements, (iv) deliberately failed to provide complete responses to Plaintiff's repeated OPRA requests, thereby forcing Plaintiff to appear at its appeal with an incomplete record, (v) relied on doctored/fake documents previously withheld by the City and introduced for the first time at the time of the appeal hearing, (vi) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent, and (vii) improperly placed liability on Plaintiff for prior rents collected by the prior owners of the Property.

124.    By deliberately, unreasonably, arbitrarily and capriciously engaging in the aforementioned conduct, Defendants knew, or should have known, that they were violating Plaintiffs' established constitutional rights by denying Plaintiffs one of the fundamental elements of procedural due process, and it was not objectively reasonable for Defendants to believe that its conduct did not violate Plaintiffs' established constitutional rights to procedural due process.

125.    The actions of Defendants as aforesaid were taken out of ill will and designed to harm Plaintiffs and to deny them the legal and proper use of their property.

126.    Defendants acted with knowledge that its actions against Plaintiffs were unrelated to any legitimate government interest.

127.    As such, by the aforementioned conduct, Defendants have denied Plaintiffs their

rights, privileges and immunities secured by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## COUNT FOUR
## CLAIM IN LIEU OF PREROGATIVE WRIT
### (Relief from Denial of Appeal)

128.    Plaintiff repeats and re-alleges each of the foregoing allegations as if they were fully set forth at length herein.

129.    The Board's denial of Plaintiff's appeal was arbitrary, capricious, unreasonable, without legal or factual basis, and an abuse of discretion because, among other things, Defendants (i) improperly calculated the rent for Plaintiff's tenant, who was a politically favored citizen, for the benefit of that citizen and at the expense of Plaintiff, (ii) improperly disregarded the City's Ordinance, (iii) improperly disregarded its own records, including its own permits, stickers, Certificates, and Rent Registration Statements, (iv) deliberately failed to provide complete responses to Plaintiff's repeated OPRA requests, thereby forcing Plaintiff to appear at its appeal with an incomplete record, (v) relied on doctored/fake documents previously withheld by the City and introduced for the first time at the time of the appeal hearing, and (vi) failed to provide any mechanism to object to Plaintiff's tenant's demand for a recalculation of his rent.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants:

a.    declaring that Defendants violated the Fifth and Fourteenth Amendments of the United States Constitution;

b.    awarding injunctive relief prohibiting and enjoining Defendants from interfering with or unlawfully targeting Plaintiff's business and use of its Property;

c.    finding that the Board acted in an arbitrary and capricious manner, and reversing the Board's decision relating to the rent calculation of the Rent Leveling Board as to Plaintiff's tenant;

d.      declaring that the 2019 Ordinance and all amendments thereto, which purports to limit, diminish, alter or impair the constitutional protected rights of Plaintiff, unconstitutional;

e.      awarding compensatory damages;

f.      awarding exemplary and punitive damages;

g.      awarding treble damages;

h.      awarding attorneys' fees; and

i.      awarding such other and further relief as the Court may deem just and proper either in law or in equity.

Dated: May 29, 2022                    **KRANJAC TRIPODI & PARTNERS LLP**

By: s/Xavier M. Bailliard_____
            Xavier M. Bailliard
            James Van Splinter
            30 Wall Street, 12th Floor
            New York, NY 10005
            Tel: (646) 216-2400
            Fax: (646) 216-2373
            xbailliard@ktpllp.com
            jvansplinter@ktpllp.com

            *Attorneys for Plaintiff*

27

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

I hereby certify that, to the best of my knowledge, information and belief, the matter in controversy is otherwise not the subject of any action pending in any Court or of a pending arbitration proceeding and that no other action or arbitration proceeding is contemplated.


Dated: May 29, 2022                                  s/ Xavier M. Bailliard
                                                            Xavier M. Bailliard